520 Pa. 266 (1989)
553 A.2d 948
COMMONWEALTH of Pennsylvania, PENNSYLVANIA LIQUOR CONTROL BOARD, Appellant,
v.
INDEPENDENT STATE STORES UNION, Appellee.
Supreme Court of Pennsylvania.
Argued May 9, 1988.
Decided February 6, 1989.
*267 *268 Frank P. Clark, Harrisburg, Steven O. Newhouse, Asst. Counsel, John D. Raup, Chief Counsel, Harrisburg, Office of Adm. and Budget, for appellant.
John D. Killian, Thomas W. Scott, Harrisburg, for appellee.
Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS, and STOUT, JJ.

OPINION
NIX, Chief Justice.
This appeal concerns a labor arbitration award reversing the dismissal of an employee of the Pennsylvania Liquor Control Board ("LCB"). When the award was affirmed by the Commonwealth Court, the LCB petitioned this Court for an allowance of appeal, which we granted because of the importance of the issues involved.
The subject of the arbitration award was a Mr. Albert McCardle, who, until July of 1984, was employed by the LCB as a General Manager 1B, a first-level supervisory *269 position. Mr. McCardle was assigned to an LCB store located in Bridgeville, Pennsylvania, and, in accordance with his job classification, was responsible for the store and the direction of its personnel. On July 13, 1984, McCardle was suspended from his position, in the course of an LCB investigation relating to the falsification of store documents and the disappearance of moneys or other property from the Bridgeville store.
The LCB investigation brought forth evidence that Mr. McCardle had falsified store business records and had misappropriated funds belonging to his employer. As to the business records, the investigation revealed that McCardle had committed numerous improprieties, including the following:
(a) On four occasions falsified store records so as to indicate the non-receipt of merchandise which had in fact been received by the store.
(b) On one occasion manipulated store records to conceal the receipt of a customer's cash deposit.
(c) On one occasion falsified the inventory count.
(d) On two occasions voided records of retail sales that had in fact been made.
(e) On more than ninety occasions rang improper product codes or improper product prices on cash registers operated by him.
An audit disclosed that $2,981.38 in store funds was missing; of that amount, $1,384.91 was directly attributed to McCardle. The LCB proceeded to recover the latter amount from his salary.
On July 31, 1984, about two weeks after McCardle's suspension, and apparently while the LCB investigation was still in progress, McCardle entered a Veterans Administration Hospital. Shortly thereafter, McCardle's union told the LCB that he was suffering from mental illness. In response to that assertion, the employer asked that it be supplied with substantiating information by August 17, 1984. When no such information was provided, the LCB, by a decision dated August 23, 1984, terminated McCardle's *270 employment. The stated basis for the discharge was that he had manipulated LCB documents, had misappropriated Commonwealth funds, and had failed to perform the duties of his position.[1]
As a General Manager 1B, McCardle was represented by the Independent State Stores Union ("Union"). On August 28, 1984, the Union advised the LCB of its intention to grieve his dismissal. The Union alleged that McCardle's misconduct was caused by "severe psychological problems which resulted in bizarre and unexplainable behavior." Together with that contention, the Union asked that McCardle be placed on sick leave until he was able to resume his duties. After the grievance was denied at the prescribed preliminary stages of consideration, the Union took the matter to arbitration, pursuant to a labor agreement in force between the Union and the Commonwealth of Pennsylvania.
The labor agreement, styled "Memorandum of Understanding," is relatively laconic in its treatment of the employer's disciplinary powers. The central provision on that subject states: "The Commonwealth shall not demote for disciplinary reasons, suspend, discharge or take any other disciplinary action against any manager without just cause." (Emphasis added.) Although the Memorandum itself does not give a definition of "just cause," such is provided in the Work Rules and Regulations published by the LCB. In those Rules the agency set forth a list of offenses which could result in "disciplinary action" against an employee. The Rules also specify a class of offenses which may provide "just cause" for immediate dismissal. Included in the latter group of designated infractions are: "Theft of Commonwealth funds or property" and "Serious violation of counter procedures."
Regarding the arbitration of grievances, the Memorandum of Understanding provides, inter alia, that "[t]he *271 decision of the arbitrator shall be final and binding on both parties." In the matter of McCardle's grievance, the parties stipulated that only two questions were present for the arbitrator's consideration: "Was the [g]rievant dismissed for just cause, and if not, what shall the remedy be?"
At the hearing before the arbitrator, the grievant did not contest the charges that were the basis for his dismissal. Indeed, Mr. McCardle admitted his guilt. The Union, however, renewing its contention that McCardle's breach of trust was the product of mental illness, argued that he was not responsible for his actions and thus should have received a penalty less severe than discharge.
As to McCardle's mental condition, the Union established that he had undergone psychiatric treatment at the Veterans Hospital for approximately seven months following his termination by the LCB. His period of treatment included both in-patient and out-patient care. The Union also put into evidence the opinions of a psychologist and a psychiatrist from the hospital, both of whom stated that the grievant was suffering from a stress-related mental disorder. The employer offered no evidence to contradict those opinions, but did seek to challenge their weight regarding the question of what caused the grievant's dishonest acts.
In keeping with the evidence supporting the charges, the arbitrator found that the grievant had committed the various acts of manipulation and misappropriation alleged. However, based on the Union's medical evidence, the arbitrator determined that the grievant's misdeeds were the result of mental illness and thus not his fault. The arbitrator also interpreted the medical evidence as indicating that the grievant was recovering from his disorder and could return to responsible employment with the LCB. Predicated on those conclusions about Mr. McCardle's mental condition, the arbitrator decided that the LCB did not have just cause for the discharge. The arbitrator further determined that the LCB should give the grievant an opportunity to demonstrate whether or not he had recovered from his mental problems so as to be "capable of responsible behavior." *272 Such opportunity, the arbitrator added, was to be provided in a way that would "limit any further damage to the employer or the employee."
Having made those determinations, the arbitrator entered an award sustaining McCardle's grievance, subject to the following terms: (1) the LCB would immediately reinstate the grievant to the status of employee, and the period following his termination would be treated as a suspension; (2) the grievant would resume employment as a Clerk II, and remain in that classification for at least six months to demonstrate whether or not he could cope with stress; and (3) if the grievant successfully completed the trial period, the time he had spent undergoing treatment at the hospital would be converted to sick leave.
The LCB challenged the arbitration award by taking an appeal to the Commonwealth Court.[2] There, the employer argued that the arbitrator's decision overruling the dismissal, and installing the grievant in another position, exceeded the arbitral powers conferred by the Memorandum of Understanding. The employer also contended that the award went beyond the scope of the actual question stipulated to the arbitrator. The Commonwealth Court rejected both arguments, and affirmed the award. Pennsylvania Liquor Control Board v. Independent State Stores Union, 100 Pa.Cmwlth. 272, 514 A.2d 959 (1986).
At the outset it must be emphasized that it has been established that the judicial scope of review of an arbitrator's decision in matters of this nature is the "essence test." Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA), 473 Pa. 576, 375 A.2d 1267 (1977). Under the essence test the court is confined to determining whether the arbitrator's decision could rationally be derived from the collective bargaining agreement. Philadelphia Housing Authority v. Union of Security Officers, 500 Pa. 213, 455 A.2d 625 (1983); Lewisburg Area Education Association *273 v. Board of School Directors, 474 Pa. 102, 376 A.2d 993 (1977).
Most recently, in our decision in County of Centre v. Musser, 519 Pa. 380, 548 A.2d 1194 (1988), we had occasion to reiterate that "[u]nder the `essence' test, ... an arbitrator's award is to be respected by the courts if it represents a reasonable interpretation of the labor agreement between the parties." Id., 519 Pa. at 390, 548 A.2d at 1198. After acknowledging this concept of judicial deference to the decision of arbitrators in the field of labor-management relations, we emphasized an important caveat which had been expressed by the United States Supreme Court in United States Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), which provided:
[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. (Emphasis added)
Thus the award will be respected by the judiciary if the award can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties intention. County of Centre, supra. From this point of reference we must proceed to analyze the issues raised in the instant appeal.
The position of the Union which was accepted by the arbitrator and the Commonwealth Court focused upon the severity of the punishment in light of their perception of the nature of the dereliction. The fallacy of this position is that the seminal issue presented to the arbitrator was whether the LCB had "just cause" for the firing of Mr. McCardle. Once it is established that the record reflects that there was "just cause" for the action taken, the inquiry must close *274 and the action of the agency must be accepted. Thus if "just cause" for the action was present, any further effort on the part of the arbitrator to disturb the agency's action can not be said to flow from the essence of the bargaining agreement nor can it in any rational way be derived from that agreement.
In reviewing this matter, the Commonwealth Court purported to apply the "essence test" and concluded that the arbitrator's actions did comport with that standard. In the process of reaching that conclusion the court began, quite logically, with the Memorandum of Understanding. Taking first the provision therein for arbitrating disciplinary grievances, and, second, the provision that the arbitrator's decision was to be "final and binding," the Commonwealth Court determined that the McCardle award could not be judicially disturbed. With regard to the arbitrator's finding that the dismissal of the grievant did not rest upon just cause, the court agreed, stating: "[w]e do not see how the discharge of a mentally ill individual can be said to be for `just cause.'" 100 Pa.Cmwlth. at 276, 514 A.2d 961. In the court's view, it was valid for the arbitrator to resolve that question by applying concepts of mental responsibility borrowed from the area of criminal law. Id. at 277, 514 A.2d at 961. In connection with that view, the court deemed inapplicable our decision in Philadelphia Housing Authority v. Union of Security Officers # 1, supra, in which we held that an arbitrator exceeded his powers by overruling the discharge of an employee who had been terminated for acts of fraud.
In affirming the McCardle arbitration award, the Commonwealth Court also rejected the LCB's contention that the award went beyond the issues submitted to the arbitrator by stipulation. Upon this point, the court observed that the arbitrator simply decided whether or not there was "just cause" for the grievant's dismissal, and if not, what the remedy was to be  which were the very questions raised by the stipulation.
*275 In this appeal the LCB argues, as it did below, that the arbitrator's decision overruling the dismissal exceeded his powers under the Memorandum and was therefore invalid. According to the LCB, Albert McCardle's numerous acts of misappropriation and falsification of records clearly constituted "just cause" for his discharge, and that the resolution of his grievance at arbitration should have been governed by this Court's decision in Philadelphia Housing Authority v. Union of Security Officers # 1, supra. We agree.
The Philadelphia Housing Authority appeal involved a security guard, employed at a public housing project, who was dismissed by his governmental employer for defrauding an elderly tenant. An arbitrator determined that the sanction of discharge was too severe, based on his finding that the guard's dishonest acts were perpetrated through exploitation of a personal relationship with the victim and not through misuse of official status. The arbitrator then proceeded to enter an award reducing the sanction to a period of suspension, equal to the time between the dismissal and the arbitration hearing, with the result that immediate reinstatement was to follow. This Court, upon review, set aside the arbitrator's award, holding that it exceeded his powers under the collective bargaining agreement between the parties.
In deciding Philadelphia Housing Authority, this Court observed that the employer in question had an absolute responsibility to maintain the integrity of its security force, if for no other reason than to protect the tenants of its housing projects. Id., 500 Pa. at 216, 455 A.2d at 627. With that consideration in mind, we also observed that nothing in the collective bargaining agreement suggested that the employer intended to bargain away its responsibility and the power to enforce it by discharging dishonest guards. Any conclusion that the employer had so intended, was characterized by us as being "manifestly unreasonable."
[I]t is manifestly unreasonable to conclude that the Housing Authority could have intended to bargain away its *276 absolute responsibility to ensure the integrity of its housing security force by discharging an officer who has defrauded one of the very people whom he is paid to protect.
Id., 500 Pa. at 216, 455 A.2d at 627.
It would also be "manifestly unreasonable" to conclude that any agency of this Commonwealth, regardless of whether it is acting in a governmental or proprietary function, intended to bargain away its responsibility to ensure the financial integrity of its operation by discharging an employee who has misappropriated funds and falsified records. As noted in County of Centre v. Musser, supra, the "essence test" standard of review includes the decisional teaching of Philadelphia Housing Authority v. Union of Security Officers, supra. If an agency of the Commonwealth entered into an agreement which expressly excluded conduct by an employee, of the nature herein, from the definition of "just cause" for discharging that employee, its validity would at best be questionable. We are here called upon to infer such an exception, which is clearly an untenable position.
In this context it must be stressed that the fact of the misappropriations and the falsification of records by McCardle is not disputed. It is also to be noted that when the LCB was first advised of the claimed emotional problems, the Board provided an opportunity to McCardle to supply that body with any information he wished relating to that condition. The ultimate action by the Board was taken only after McCardle made no effort to take advantage of that offer. Moreover, the concepts of culpability and mitigation applicable in criminal law are not applicable to this area. In this setting the issue must be confined to the competency and ability of the employee to perform the tasks required by the position in which he is serving. The fact that the dereliction may not have been maliciously inspired or that at some future time the impediment which occasioned the unsatisfactory performance may be removed, has no place in the inquiry. These are considerations *277 that can be expressly set forth in a bargaining agreement with conditions and restrictions that the parties mutually establish. It would be destructive to permit an arbitrator to design provisions of this nature ex cathedra beyond the bargaining process and without the board having the opportunity of discharging its fundamental responsibility to protect the integrity of its operation.
The employer in the instant case, the LCB, is a governmental agency whose statutorily mandated functions include the retail and wholesale distribution of bottled liquors and wines within this Commonwealth. See sections 207 and 305 of the Liquor Code, Act of April 12, 1951, P.L. 90, as amended, 47 P.S. §§ 2-207, 3-305. The LCB, having a state-wide monopoly in that respect, has been characterized as the nation's largest retail distributor of alcoholic beverages. Needless to say, the LCB, pursuant to its distributional function, has responsibility for enormous inventories of merchandise and vast amounts of money resulting from sales. It is equally obvious that the LCB, given its legal responsibilities, must be able to maintain honesty and integrity on the part of its employees who have ready access to its wares and revenues.[3] To that end, the power of the LCB to discharge any employee who is proven to have stolen property from the agency is one of unquestionable importance and presumptively retained by management. We find nothing in the labor agreement here involved or any circumstance to suggest that the LCB had "bargained away" its power to discharge a proven thief; and it would be "manifestly unreasonable" to conclude that the agency intended to do so. In this connection, it should be recognized that a governmental agency does not have the freedom of a private enterprise to relinquish powers inherently *278 essential to the proper discharge of its function. County of Centre v. Musser, supra.
The arbitrator concurred in the LCB findings that Mr. McCardle committed the charged acts of impropriety. That finding established the "just cause" for the dismissal. At that point, the inquiry should have ended and the LCB action sustained. The further actions by the arbitrator in this matter cannot rationally be derived from the collective bargaining agreement. The arbitrator's efforts in this instance to fashion "his own brand of industrial justice" must be rejected.
Accordingly, the order of the Commonwealth affirming the action of the arbitrator is reversed and the discharge of appellee is reinstated.
PAPADAKOS, J., files a concurring opinion in which he joins this opinion.
LARSEN, J., files a dissenting opinion.
ZAPPALA, J., files a dissenting opinion in which LARSEN, J., joins.
PAPADAKOS, Justice, concurring.
I join in the opinion of the majority but write separately to express my view that the concept of "good cause" must be limited by an element of justification or excusability. I do not believe that the mere happening of misconduct, in itself, closes the inquiry and mandates "discharge for good cause." I believe an employee has the right to explain away the dereliction. Surely, an employee who suffers amnesia and wanders away from family, friends and acquaintances for several months and thereby fails to report to work for an extended period of time should be able to prove this circumstance and thus avoid "discharge for good cause." In this case, McCardle was given the opportunity to explain away the dereliction and failed to do so. Under these circumstances, I can agree that the Liquor Control Board had "just cause" for the firing of McCardle and the inquiry should have ended there.
*279 LARSEN, Justice, dissenting.
I dissent, and in support adopt the opinion of the Commonwealth Court, authored by Judge MacPhail and joined by Judge Colins and Senior Judge Rogers.
Unlike in County of Centre, Centre County Prison Board v. Musser, 519 Pa. 380, 548 A.2d 1194 (1988) and Philadelphia Housing Authority v. Union of Security Officers # 1, 500 Pa. 213, 455 A.2d 625 (1983), the misconduct of the employee, Mr. Albert McCardle, which gave rise to his discharge was accompanied by a mitigating factor reducing the employee's culpability, i.e., his mental illness. The arbitrator considered the evidence of Mr. McCardle's mental illness and found that his discharge was not based upon "just cause" because his conduct was mitigated by said mental illness. The majority holds that such an interpretation of "just cause" by the arbitrator was outside of the "essence" of the bargaining agreement because "the concepts of culpability and mitigation applicable in criminal law are not applicable to this area." At 276. I agree with Mr. Justice Papadakos (in his concurring opinion in this case) and the Commonwealth Court that, contrary to the majority's assertion, such concepts of mitigation and culpability are most certainly applicable to a grievance proceeding intended to determine whether there was "just cause" for discharge within the terms of the collective bargaining agreement and that an arbitrator acts within his or her authority in applying such concepts.
As the Commonwealth Court stated in distinguishing Philadelphia Housing Authority from the instant case:
It is true that in the case at bar we are also dealing with an employee whose integrity is at question. There is, however, an additional mitigating factor. The arbitrator found that Mr. McCardle was not responsible for his actions because of his mental state. We do not see how the discharge of a mentally ill individual can be said to be for "just cause." In a humane society, public employers should foster the rehabilitation of such individuals. A discharge does not encourage rehabilitation. We feel *280 that the arbitrator's resolution of the problem was a prudent one. He held that the period from when Mr. McCardle was terminated until the time he started working in his new position should be considered a suspension with the period of time he underwent treatment to be converted to sick leave if he successfully completes his six month probationary period. While passing on the wisdom of the award is beyond our scope of review, we are constrained to comment that the arbitrator in this case acted wisely. His award most certainly meets the essence test.
The Board argues that at the time it terminated Mr. McCardle it did not know of his mental condition. This argument misses the point. The point is that Mr. McCardle was, according to the arbitrator, mentally ill. The arbitrator was justified in using information gleaned after Mr. McCardle's termination in determining whether or not just cause existed at the time the termination took place. Such determinations of mental state are, of course, made in the area of criminal law quite frequently.
The Board points out that the award of an arbitrator will be set aside where the arbitrator exceeds the scope of issues presented to him by the parties, American Federation of State, County and Municipal Employees v. City of Beaver Falls, 74 Pa.Commonwealth Ct. 136, 459 A.2d 863 (1983). It argues that the arbitrator did so in this case. We disagree. The arbitrator decided precisely what was before him: whether Mr. McCardle had been discharged for just cause and what the remedy should be if he had not been so discharged.
In my opinion, the arbitrator's award did indeed derive its essence from the collective bargaining agreement in determining that Mr. McCardle's discharge was not for just cause and in crafting an appropriate remedy. Accordingly, I would affirm the Commonwealth Court.
ZAPPALA, Justice, dissenting.
I dissent. I cannot countenance the majority's theory that a public employer presumptively would not (cannot?) *281 bargain away the ultimate determination of the appropriate discipline for theft. There may be strong policy reasons why the legislature might impose such limits on public agencies, or the governor might direct his cabinet officials to reject any agreement that did not contain such a reservation of power. They have not done so, and I think it beyond the power of this Court to interpose such a policy by determining "presumptively" what a public employer can or cannot do by way of contract.
In County of Centre v. Musser, 519 Pa. 380, 548 A.2d 1194 (1988), the collective bargaining agreement clearly reserved to the prison board the exclusive power to determine the appropriate discipline. The arbitrator exceeded his authority by interpreting the agreement so as to give himself the authority to modify the discipline; the award did not draw its essence from the agreement. In this case, no such language was included in the Memorandum of Understanding. The arbitrator was given broad authority over disputes "concerning the interpretation or application" of the provisions of the agreement. Absent an explicit reservation of power to the employer, I think it was within the arbitrator's authority to construe the agreement as he did.
Having read the record, I most certainly would not have reached the same conclusion, but the parties did not bargain for my interpretation of their Memorandum, nor did they bargain for a court's interpretation. The Commonwealth Court was correct in refusing to overturn the arbitrator's decision, although I must reject outright the gratuitous comments offered in that court's opinion, that
[w]e do not see how the discharge of a mentally ill individual can be said to be for "just cause." In a humane society, public employers should foster the rehabilitation of such individuals. A discharge does not encourage rehabilitation.
Whatever the merits of this paternalistic, statist philosophy, it is not the court's function to set such a policy.
This Court, however, exceeds the scope of the essence test by reading into the contract a presumption that the *282 LCB would not have bargained away certain authority. Had this been its intention, the LCB was certainly capable of including the necessary language in the Memorandum, as did the prison board in County of Centre.
LARSEN, J., joins in this dissenting opinion.
NOTES
[1] As a result of the charges relating to document falsification and misappropriation of funds, criminal proceedings were initiated against Albert McCardle. He was subsequently admitted to the Accelerated Rehabilitative Disposition Program.
[2] See 42 Pa.C.S. § 763(b).
[3] The LCB saw fit to remind its employees of this simple truth by memorializing it in the Work Rules and Regulations. In a prologue to the list of sanctionable conduct, the Rules state the following: "In order to best achieve our goals, there must necessarily be rules and regulations for our guidance. The first and most important is honesty... to customers, fellow employees and our agency." (Emphasis added.)